**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**April 30, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* Wis. Stat. § 808.10 and Rule 809.62.

**Appeal No. 2018AP1052**

**STATE OF WISCONSIN**

Cir. Ct. No. 2015CV1253

**IN COURT OF APPEALS**
**DISTRICT IV**

---

PROFORMANCE MANUFACTURING, INC.,

    PLAINTIFF-APPELLANT-CROSS-RESPONDENT,

V.

TEEL PLASTICS, INC.,

    DEFENDANT-RESPONDENT-CROSS-APPELLANT.

---

APPEAL and CROSS-APPEAL from a judgment of the circuit court for Dane County: JULIE GENOVESE, Judge. *Affirmed.*

Before Fitzpatrick, P.J., Blanchard and Kloppenburg, JJ.

¶1 FITZPATRICK, P.J. Proformance Manufacturing, Inc. and Teel Plastics, Inc. entered into two contracts concerning a fiberglass window system.[1]

---

[1] For convenience, we will refer to Proformance Manufacturing, Inc. as "PMI" and Teel Plastics, Inc. as "Teel."

PMI brought suit against Teel in the Dane County Circuit Court alleging, among other things, that Teel breached those contracts and that Teel was unjustly enriched.[2]  A jury found that Teel breached both contracts and awarded PMI $3,000,000 in damages based on those breaches.[3]  The jury also found that Teel was unjustly enriched by its actions and awarded PMI $2,000,000 in damages on that claim.

¶2      PMI filed postverdict motions in the circuit court requesting:  (1) an award of attorney fees incurred in this litigation; and (2) an award of preverdict interest on the damages awarded by the jury.  Teel filed postverdict motions requesting that the circuit court:  (1) change the jury's answers to special verdict questions concerning the unjust enrichment claim and breach of contract damages; (2) grant a new trial because the circuit court did not read to the jury Teel's proposed instructions on partnerships and patent law; (3) grant a new trial in the interests of justice because PMI argued to the jury that a partnership existed between the parties; and (4) grant a new trial on aspects of the breach of contract claim.

¶3      The circuit court denied each of the postverdict motions with one exception.  The circuit court granted Teel's request to change the answers to the unjust enrichment claim questions in the special verdict.  This ruling had the effect

---

[2] PMI does not appeal the circuit court's dismissal of its fraud and conversion claims.

[3] The jury also found that Teel breached its duty of good faith and fair dealing that Teel owed to PMI related to each contract.  The parties do not contend that the jury's answers to those questions on the special verdict are material to our analysis.  With a few exceptions, we will also ignore the breach of good faith and fair dealing findings by the jury.

of negating the jury's $2,000,000 award of damages to PMI for that cause of action.

¶4     PMI appeals, Teel cross-appeals, and we affirm the circuit court's orders on the postverdict motions.

## BACKGROUND

¶5     The following facts are consistent with the jury's answers to the special verdict questions and the circuit court's postverdict decisions.

### The Parties and the ECOSTAR Windows

¶6     Beginning in 2002, and for several years, PMI assembled, fabricated, and sold windows designed by other companies.  In 2011, PMI began selling a window system it designed, called ECOSTAR.

¶7     Teel was primarily a plastics-related company and did not make windows.  PMI hired several suppliers, including Teel, to provide parts for its ECOSTAR windows.  As part of that process, Teel converted PMI's window designs into engineering drawings.  Appearing on the engineering drawings prepared by Teel for the ECOSTAR window system were PMI's name and PMI's copyright claim.

### Contacts Between Teel and Hardie

¶8     A large house-siding company, James Hardie (which we will refer to as "Hardie"), learned of the ECOSTAR window system.  Hardie contacted Teel in July 2011 about the ECOSTAR windows, not realizing that the system was designed, and owned, by PMI.  Hardie told Teel at that time that it wanted to

acquire a new, unique window system, be the ultimate manufacturer of that system, and have as its own design one that was already available.

¶9    In response, Teel told Hardie that it looked forward to "explor[ing] the possibilities to work with [Hardie] on a new window system," without telling Hardie that the ECOSTAR window design belonged to PMI. As part of that response, Teel sent to Hardie already-existing photos of PMI's ECOSTAR windows. Before sending the photos to Hardie, Teel changed the photos' captions from stating "PMI Casement" to "Teel designed Casement Window."

¶10    Hardie told Teel as early as August 11, 2011, that it was interested in purchasing Teel's plastic pultrusion division. Teel responded to that interest by presenting Hardie with engineering drawings for the ECOSTAR windows. Those drawings were copies of PMI's ECOSTAR window system drawings but were changed by Teel to refer to the window system as the "Hardie Concept Profile Drawings." Before sending the drawings to Hardie, Teel also replaced the ECOSTAR and PMI name on the drawings with "James Hardie Window & Door Systems." Teel further changed the drawings sent to Hardie to falsely reflect that Teel held the copyright to those drawings and the rights to the designs.

¶11    In mid-August 2011, Teel was in possession of confidential cost information provided by PMI to Teel for the ECOSTAR window system. When Hardie requested the information, Teel sent PMI's confidential cost information to Hardie, and Teel represented that the information was its own.

**Teel-PMI Communications and Contracts**

¶12    Also in mid-August 2011, a Teel employee contacted PMI requesting permission to show a completed PMI ECOSTAR window to a

4

company not named by Teel. PMI agreed, but told Teel that PMI's proprietary information must be kept secret, including the drawings for the window.

¶13     On August 30, 2011, Teel representatives met with PMI representatives and told PMI that Teel had a large customer interested in PMI's ECOSTAR window system. Teel did not disclose the name of the potential customer to PMI at that time. Nor did Teel disclose to PMI that, as already described, it had taken credit for PMI's design in communications with Hardie, changed the description of who owned the design on photos Teel sent to Hardie, and gave to Hardie PMI's cost information for the ECOSTAR windows.

¶14     At the same meeting with PMI, Teel claimed for the first time that it owned some rights in the ECOSTAR window system. Teel offered to make PMI party to any agreement with the unnamed prospective customer in exchange for Teel acquiring an ownership interest in the ECOSTAR window system.

¶15     PMI entered into an oral agreement with Teel on August 30, 2011. The parties refer to this as the "50/50 agreement," and so shall we. In the 50/50 agreement, PMI agreed with Teel to sell the PMI ECOSTAR window system to Teel's as-of-then-undisclosed customer and to get that customer into the fiberglass window and door business using PMI's window design. Teel and PMI also agreed to split ownership rights to the ECOSTAR window design on an equal basis. That same day, to effectuate the 50/50 agreement, Jerry Beranek of PMI sent PMI's patent consultant an email stating:

> Eric [Rapp, the owner of PMI] and I met with the folks from Teel earlier today, we discussed the design patent potential of the window designs among other things. When I spoke with Tom Thompson [Teel's President] again this afternoon regarding the designs we agreed that any rights for design, if any, should be shared 50/50 by Teel and PMI.

¶16   On November 3, 2011, PMI filed a provisional patent application with the U.S. Patent and Trademark Office and filed a second application eight days later.  Both applications listed Jerry Beranek of PMI and Brian Emanuel of Teel as co-inventors of the window design.

¶17   Also on November 3, 2011, Teel and PMI entered into a written "Confidentiality Agreement" that, by its terms, was retroactive to August 1, 2010.  The Confidentiality Agreement stated that all "Proprietary Information" disclosed from one party to the agreement to the other shall be treated as "secret and confidential."   The Confidentiality Agreement also required express written permission before a party may disclose to others what the agreement defined as "Proprietary Information."  Germane to this appeal, "Proprietary Information" was defined as including "physical … specifications, … concepts, … plans, cost data [and] drawings."  PMI did not give Teel permission to disclose PMI's "Proprietary Information" to Hardie.

**Further Dealings With Hardie**

¶18   Teel and PMI gave an in-person presentation to Hardie in early November 2011.   In the presentation, PMI and Teel described their business relationship as a "partnership" and stated that the ECOSTAR window design's "Intellectual Property" was part of the partnership.  That presentation was the first that Hardie learned of PMI.  Hardie expressed an interest at that time in acquiring both Teel's plastics pultrusion division and PMI.

¶19   On November 26, 2011, and unbeknownst to PMI, Teel was informed by Hardie that Hardie was still interested in acquiring the PMI window technology, but that Hardie was "not comfortable with going forward" with acquiring PMI.

¶20    Two days later, on November 28, 2011, PMI and Teel signed a Management Resource Summary ("MRS").[4]  The MRS stated that PMI and Teel were working "jointly to transfer the necessary technology, intellectual property, know how, knowledge, equipment, facilities and personnel resources in order to allow … Hardie to enter into the manufacturing of window and door products, using fiberglass pultrusion."  The MRS stated that the "intellectual property" that Teel and PMI would "collectively" transfer to Hardie included the PMI ECOSTAR window designs, "trade secrets," and the joint pending patent applications.  Later, without asking or informing PMI, Teel provided to Hardie the patent applications for the PMI window designs.

¶21    PMI learned from Hardie on January 4, 2012, that Hardie was no longer interested in acquiring PMI.  In April 2012, Teel sold its pultrusion division to Hardie for $15.4 million, including the rights to the products "jointly developed" with PMI.  PMI was not informed until a later date that the ECOSTAR window system rights were included in the sale to Hardie of Teel's pultrusion division just mentioned.  PMI received no compensation for Teel's sale of the rights to the ECOSTAR window system to Hardie.

**The Litigation**

¶22    PMI initiated this action against Teel claiming, among other things, that Teel breached both the 50/50 agreement and the Confidentiality Agreement with PMI, and that Teel was unjustly enriched because of Teel's actions related to the ECOSTAR window system.

---

[4]  Neither party contends that the MRS was a contract.

¶23    At the conclusion of a six-day trial, the jury answered seven special verdict questions as follows:

I.  Breach of Contract

Question No. 1: Did Teel breach the oral agreement entered on August 30, 2011?

Answer: Yes

Question No. 2: Did Teel breach the duty of good faith in performing the oral agreement entered on August 30, 2011?

Answer: Yes

Question No. 3: Did Teel breach the Confidentiality Agreement dated November 3, 2011?

Answer: Yes

Question No. 4: Did Teel breach the duty of good faith in performing the Confidentiality Agreement dated November 3, 2011?

Answer: Yes

….

Question No. 5: What amount of money will fairly and reasonably compensate PMI for damages caused by Teel?

Answer: $3 Million

II.  Unjust Enrichment

Question No. 6: Was Teel unjustly enriched?

Answer: Yes

….

Question No. 7: What amount of money will fairly and reasonably compensate PMI for the benefit received by Teel?

Answer: $2 Million

¶24    The parties filed postverdict motions described earlier.    To summarize, in ruling on those motions, the circuit court concluded that: (1) there was insufficient evidence to support the jury's answers to special verdict questions 6 and 7 regarding the unjust enrichment claim and, as a result, the circuit court changed the answers to those questions, which had the effect of negating the jury's $2 million award to PMI for that cause of action; (2) PMI was not entitled to an award for its attorney fees or preverdict interest; (3) there was sufficient evidence to support the jury's answers to special verdict question 5 regarding damages awarded for Teel's breaches of the contracts; and (4) there were no grounds to grant a new trial.

¶25    PMI appeals, and Teel cross-appeals, the circuit court's postverdict rulings.  We will mention other material facts in the following discussion.

## DISCUSSION

¶26    We first discuss issues raised in PMI's appeal, and we then discuss issues raised in Teel's cross-appeal.

## I.  Appeal.

¶27    In its appeal, PMI argues that the circuit court erred: (1) in changing the jury's answers to special verdict questions regarding the unjust enrichment claim; (2) in denying its request for an award of attorney fees; and (3) in denying its request for an award of preverdict interest.  We address each argument in turn.

## A. Changes to Answers on the Special Verdict Regarding the Unjust Enrichment Claim.

¶28    We now discuss the standards a circuit court applies when considering a motion to change a jury's answers to special verdict questions and the standard that this court applies on review of the circuit court's decision to grant such a motion.

### 1. Applicable Standards.

¶29    A circuit court may change a jury's answer to a special verdict question if there is insufficient evidence to support the answer.  *See* WIS. STAT. § 805.14(5)(c) (2017-18)[5] ("Any party may move the court to change an answer in the verdict on the ground of insufficiency of the evidence to sustain the answer."). The sufficiency of the evidence test is set forth at § 805.14(1):

> No motion challenging the sufficiency of the evidence as a matter of law to support a verdict, or an answer in a verdict, shall be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party.

¶30    An "appellate court will overturn the circuit court's decision [granting a motion to change a jury's answer based on insufficiency of the evidence] if the circuit court was 'clearly wrong.'" ***Best Price Plumbing, Inc. v. Erie Ins. Exch.***, 2012 WI 44, ¶44, 340 Wis. 2d 307, 814 N.W.2d 419 (quoting ***Weiss v. United Fire and Cas. Co.***, 197 Wis. 2d 365, 389, 541 N.W.2d 753

---

[5] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

(1995)). "[T]he 'clearly wrong' standard and the 'no credible evidence' standard must be read together." **Weiss**, 197 Wis. 2d at 389. The circuit court's decision to change a jury's answer is "'clearly wrong'" if the verdict is supported by "'any credible evidence.'" **Best Price Plumbing**, 340 Wis. 2d 307, ¶44 (quoting **Weiss**, 197 Wis. 2d at 389).

¶31    We next summarize the circuit court's postverdict ruling on this issue and discuss applicable authorities.

### 2.  The Circuit Court Ruling and Applicable Authorities.

¶32    The circuit court changed the jury's answers to special verdict questions 6 and 7 because, as summarized by the court, "PMI is unable to identify conduct [constituting unjust enrichment] that the contracts did not cover.  Thus, there was insufficient evidence to sustain the jury's answer to question 6, and the court is changing that answer to 'No.'  Because no unjust enrichment claim exists, no damages can result."

¶33    Generally, an equitable claim by one party against another party is barred when there is a "contractual relationship" between those two parties. **Meyer v. Laser Vision Inst., LLC**, 2006 WI App 70, ¶¶22, 26, 290 Wis. 2d 764, 714 N.W.2d 223; *see* **Kramer v. Alpine Valley Resort, Inc.**, 108 Wis. 2d 417, 425, 321 N.W.2d 293 (1982).[6]  There is an exception to that "general rule … where the contract fails to address the essential elements of the parties' 'total business

---

[6] The phrase "equitable claim" in this context includes an unjust enrichment cause of action. *See* **Meyer v. Laser Vision Inst., LLC**, 2006 WI App 70, ¶¶1, 22, 26, 290 Wis. 2d 764, 714 N.W.2d 223; *see also* **Greenlee v. Rainbow Auction/Realty Co.**, 202 Wis. 2d 653, 671, 553 N.W.2d 257 (Ct. App. 1996).

relationship.'" ***Meyer***, 290 Wis. 2d 764, ¶26 (quoting ***Kramer***, 108 Wis. 2d at 425). "This exception, however, does not apply where the contract covers the aspects relevant to the plaintiff's equitable claim." ***Id.*** (citing ***Northern Crossarm Co. v. Chemical Specialties, Inc.***, 318 F. Supp. 2d 752, 766 (W.D. Wis. 2004)).

¶34 To prevail on its unjust enrichment cause of action, PMI was required to prove that it conferred a benefit on Teel. *See* WIS JI–CIVIL 3028 (stating that "[an] essential element[] of unjust enrichment [is] … a benefit conferred upon [Teel] by [PMI]"). Germane to our analysis, "Wisconsin law does not bar a party from seeking equitable relief for a benefit conferred, *if* that benefit falls outside the scope of the parties' contractual relationship." ***Meyer***, 290 Wis. 2d 764, ¶26 (quoting ***Northern Crossarm***, 318 F. Supp. 2d at 766).

### 3. Analysis.

¶35 We begin our analysis by summarizing the parties' arguments. Teel asserts that the purported benefits that PMI conferred on Teel fall within the scope of the two contracts entered into by the parties: the 50/50 agreement; and the Confidentiality Agreement. PMI contends that the 50/50 agreement and the Confidentiality Agreement were only parts of a larger business relationship between Teel and PMI to get Hardie into the window business. According to PMI, the benefits that PMI conferred on Teel were part of that larger business relationship and those same benefits were outside the scope of the parties' contractual relationships.

¶36 For the reasons discussed below, we agree with Teel that PMI's argument fails because PMI's own descriptions of the benefit it conferred on Teel,

and of the scope of the 50/50 agreement, leads to the conclusion that the purported benefit that PMI conferred on Teel falls within the scope of that contract.[7]

¶37    PMI contends in briefing in this court that "[t]he *benefit* that PMI conferred upon Teel was a 50/50 interest in PMI's window technology (which Teel's own documents confirm was 100% owned by PMI up to that point)."[8]

¶38    We now explain why the purported benefit that PMI conferred on Teel of "50/50 interest in PMI's window technology" comes within PMI's own description of the scope of the 50/50 agreement. PMI describes, in briefing in this court, how it interprets the jury's view of the scope of the 50/50 agreement. According to PMI, the jury accepted PMI's breach of contract theory "based on the evidence presented at trial that *the parties' agreement to share ownership of the window technology 50/50* precluded Teel from selling [the] technology without PMI's consent and/or payment to PMI." (Emphasis added.) PMI also describes the 50/50 agreement as follows:

---

[7] Because the alleged benefit that PMI conferred on Teel comes within the scope of the 50/50 agreement, we need not consider whether the benefit comes within the scope of the Confidentiality Agreement.

[8] PMI's argument in this court is similar to PMI's argument in the circuit court post-trial. "THE COURT:  … So what's the benefit that PMI gave? [Counsel for PMI]:  So PMI conferred the benefit, it gave -- it was a hundred percent owner of this window technology, and it gave 50 percent to Teel as a result of this conduct."

Separately, we note that, in briefing in this court, PMI describes what it refers to as "bad acts" of Teel:  (1) the presentation to Hardie of engineering drawings of the ECOSTAR window system in which Teel replaced PMI's name with Teel's name on the drawings as alleged owner and designer of the window; and (2) the presentation to Hardie of falsified captions on photos of PMI-designed windows in which Teel replaced PMI's name with its own. PMI concedes that these "bad acts" of Teel "obviously" were not "'benefits' *conferred* by PMI on Teel." (Emphasis added.)

> [T]here was evidence that *the oral agreement was a 50/50 split of PMI's window technology* in exchange for Teel bringing in Hardie. There was also evidence that it would be a breach if either party sold the window technology without the consent of the other. And there was evidence that if Teel sold the window technology to Hardie, it would have to split the proceeds 50/50 with PMI.

(Emphasis added.) (Citations to the record omitted.) PMI makes the same contention in its reply brief in this court by stating:

> The doctored photos and plagiarized drawings enabled Teel to interest Hardie in a business opportunity – PMI's window technology. Teel then leveraged [the Hardie] business opportunity, which should have been solely PMI's, into a 50/50 agreement with PMI to share the window technology based on Teel's promises to bring in a "big customer."[9]

¶39     PMI's own position in this court that the 50/50 agreement caused the parties to "share ownership of the window technology 50/50" necessarily includes, as phrased by PMI, the alleged benefit that PMI conferred on Teel of a "50/50 interest in the PMI window technology." Moreover, PMI does not provide any evidentiary support for its unjust enrichment claim premised on its having given Teel half of the interest in the window technology *except* through PMI's compliance with the terms of the 50/50 agreement. Accordingly, the shared window technology benefit that PMI purportedly conferred on Teel falls squarely within the "scope" of that agreement and is "covered" by that contract. *See Meyer*, 290 Wis. 2d 764, ¶26.

---

[9] To the extent PMI argues that Teel's "bad acts" described in footnote 8 induced PMI to enter into the 50/50 agreement, we reject that contention because the circuit court, in a pretrial ruling, dismissed PMI's claim that "Teel committed fraud by: (1) fraudulently inducing PMI to share ownership in the PMI window technology 50/50, and (2) failing to disclose negotiations with and the eventual sale of the window design to Hardie." PMI does not appeal that ruling of the circuit court.

#### 4. PMI's Other Arguments.

¶40     PMI makes two other arguments in support of its contention that the circuit court erred in changing the answers to special verdict questions 6 and 7. We are not persuaded.

¶41     PMI first argues that the benefits PMI conferred on Teel cannot be within the scope of the contracts between the parties because of one phrase in a jury instruction. Regarding damages, the jury was instructed to "be careful not to include or duplicate in any answer amounts included in another answer made by you." The jury awarded damages for the breach of contract claims in question 5 of the special verdict and awarded damages for the unjust enrichment claim in question 7 of the special verdict. From those facts, PMI asserts that the jury implicitly found that benefits PMI conferred on Teel did not fall within the scope of any contract between the parties because the jury found a different set of damages for the breach of contract claim as opposed to the unjust enrichment claim. PMI's argument misses the mark because the relied-on jury instruction concerns only the damage awards. The jury was not asked to decide whether any "benefits conferred" by PMI on Teel came within the scope of any contract entered into between the parties, and PMI does not demonstrate why we should infer that finding from the verdict. Therefore, PMI's argument fails.

¶42     Second, PMI contends that its unjust enrichment claim survives even if the benefits conferred by PMI on Teel come within the scope of the parties' contractual relationships. For this proposition, PMI relies on the RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 3 cmt. c (2011). PMI conceded at argument that the portion of the RESTATEMENT relied on has not been adopted by any Wisconsin court. For that same proposition, PMI also relies on

two federal district court opinions, ***Robinson v. Fountainhead Title Group Corporation***, 447 F. Supp. 2d 478, 493 (D.Md. 2006) and ***R.J. Wildner Contracting Co. v. Ohio Turnpike Commission***, 913 F. Supp. 1031, 1043 (N.D. Ohio 1996). Those opinions discuss Maryland and Ohio law, respectively, and not Wisconsin law. So, PMI's proposition does not rely on Wisconsin law.

¶43 Moreover, the conclusions in that RESTATEMENT comment and the two federal district court opinions are that an unjust enrichment claim is *not* barred when the benefit conferred by one party on another comes within the scope of a contract between those same parties. As a result, those authorities are in direct opposition to the holdings of the Wisconsin Supreme Court and this court already discussed. *See Meyer*, 290 Wis. 2d 764, ¶¶22, 26; ***Kramer***, 108 Wis. 2d at 425. We may not ignore those binding authorities as PMI requests. *See **Cook v. Cook***, 208 Wis. 2d 166, 189-90, 560 N.W.2d 246 (1997) (stating that this court is bound by holdings of the Wisconsin Supreme Court and published decisions of the Court of Appeals). For those reasons, PMI's argument fails.

¶44 In sum, we conclude that PMI's unjust enrichment claim was barred based on PMI's contractual relationship with Teel, and we affirm the circuit court's order changing the answers to questions 6 and 7 of the special verdict.[10]

---

[10] Teel argues that the jury's special verdict answers regarding PMI's unjust enrichment claim were that of an advisory jury pursuant to WIS. STAT. § 805.02(1), which states: "In all actions not triable of right by a jury, the court upon motion or on its own initiative may try any issue with an advisory jury." In light of our conclusion that PMI's unjust enrichment claim fails, we need not address that argument.

### B. PMI's Request for an Award of Attorney Fees.

¶45     PMI asserts that the circuit court erred in denying its requests for an award of attorney fees.  Whether there is a legal basis to award attorney fees is a question of law this court reviews de novo.  *See **Nationstar Mortg. LLC v. Stafsholt***, 2018 WI 21, ¶23, 380 Wis. 2d 284, 908 N.W.2d 784.

¶46     Under the American Rule regarding an award of attorney fees, each party is responsible for payment of their own attorney fees.  ***Estate of Kriefall v. Sizzler USA Franchise, Inc.***, 2012 WI 70, ¶72, 342 Wis. 2d 29, 816 N.W.2d 853.  Limited exceptions to the American Rule exist, including awards for attorney fees as provided by statute or through provisions of a contract.  ***Id.***; *see also **Stafsholt***, 380 Wis. 2d 284, ¶27.  In ***Stafsholt***, our supreme court recognized another exception to the American Rule in that, as an equitable remedy, a court may award attorney fees "in exceptional cases and for dominating reasons of justice."  ***Id.***, ¶24 (quoting ***Sprague v. Ticonic Nat. Bank***, 307 U.S. 161, 167 (1939)).

¶47     In its brief-in-chief in this court, citing ***Stafsholt***, 380 Wis. 2d 284, ¶35, PMI contends that a basis for an award of attorney fees was the jury's finding that Teel breached its duty of good faith and fair dealing in regard to both the 50/50 agreement and the Confidentiality Agreement.  However, in its reply brief, PMI does not dispute Teel's responsive argument that a breach of the duty of good faith and fair dealing does not support an award of attorney fees pursuant to the exception to the American Rule recognized in ***Stafsholt***.  As a result, we consider that assertion from PMI abandoned.  *See **United Coop. v. Frontier FS Coop.***, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (stating that a failure to refute a proposition asserted in a response brief may be taken as a concession).

¶48    PMI also relies on its unjust enrichment claim as a basis for the award of attorney fees under the exception to the American Rule recognized in *Stafsholt*. Because PMI's unjust enrichment claim fails for reasons already noted, it follows that PMI's request for attorney fees based on that claim must also fail.

¶49    Accordingly, we affirm the ruling of the circuit court that denied PMI's request for an award of attorney fees.

### C. PMI's Request for an Award of Preverdict Interest.

¶50    PMI asserts that the circuit court erred in denying its request for an award of preverdict interest when the circuit court concluded that the breach of contract damages award was not, before trial, "subject to a reasonably exact determination."

¶51    Whether a party is entitled to preverdict interest is a question of law that this court reviews de novo. *Beacon Bowl, Inc. v. Wisconsin Elec. Power Co.*, 176 Wis. 2d 740, 776, 501 N.W.2d 788 (1993). Preverdict interest is recoverable only when, before trial, "damages are either liquidated or liquidable, that is, there is a reasonably certain standard of measurement by the correct application of which one can ascertain the amount he or she owes." *Teff v. Unity Health Plans Ins. Corp.*, 2003 WI App 115, ¶43, 265 Wis. 2d 703, 666 N.W.2d 38. PMI advances three arguments in support of its request for preverdict interest, and we reject each.

¶52    First, PMI contends that, because the jury was instructed that damages can be awarded only if there is "a reasonable certainty" that the damages

have been proved, it then follows that the breach of contract damages awarded by the jury met the requirement for an award of preverdict interest.[11] We reject PMI's contention because the phrase in the jury instruction relied on by PMI, "reasonable certainty," concerns only PMI's burden to establish breach of contract damages. The special verdict and jury instructions did not request that the jury make findings required for an award of prejudgment interest. In other words, PMI gives us no reason to conclude that the "reasonable certainty" phrase in the damages jury instruction is the equivalent of the "reasonably certain standard of measurement by the correct application of which" it can be determined before trial the amount owed so as to allow an award of preverdict interest. *Id.*

¶53  PMI next argues that, even if it cannot meet the standards for an award of prejudgment interest set forth in Wisconsin law, it should be awarded preverdict interest as "a matter of equity and fairness." To support its argument, PMI relies on the holding in ***Kansas v. Colorado***, 533 U.S. 1, 9-11 (2001). We agree with Teel that the holding of the U.S. Supreme Court in ***Kansas*** concerned an award of preverdict interest under federal law rather than Wisconsin law. *See id.* As a result, that holding does not inform our analysis of this issue.

---

[11] WISCONSIN JI—CIVIL 1700 was read to the jury and states in pertinent part:

> In considering the amount to be inserted by you in answer to each damage question, the burden of proof rests upon each person claiming damages *to satisfy you by the greater weight of the credible evidence, to a reasonable certainty*, that the person sustained damages with respect to the element or elements mentioned in the question and the amount of the damages.

(Emphasis added.)

¶54    Finally, PMI refers to what it considers "question[ing]" of Wisconsin law concerning preverdict interest awards in ***Nelson v. Travelers Insurance Company***, 102 Wis. 2d 159, 169, 306 N.W.2d 71 (1981).  But, the holding in ***Nelson*** concerned postverdict interest and does not apply here.  *See **id.*** at 169-70 ("In this case we need not pursue this line of reasoning to its logical conclusion since we are dealing with postverdict interest only …."); *see also **Beacon Bowl***, 176 Wis. 2d at 779 (observing that ***Nelson***'s holdings concerned only postverdict interest).  At any rate, even if there was "questioning" in that opinion, we are not at liberty to change the standards for an award of preverdict interest.  Only our supreme court has the authority to modify its own holdings or binding precedent of this court.  *See **Cook***, 208 Wis. 2d at 189-90; ***State v. Young***, 2009 WI App 22, ¶21, 316 Wis. 2d 114, 762 N.W.2d 736.

¶55    PMI has failed to demonstrate that it is entitled to preverdict interest, and we affirm the order of the circuit court.[12]

¶56    In sum, we reject PMI's appeal and affirm those orders of the circuit court.[13]

---

[12] PMI mentions in a cursory manner, and for the first time in this court in its reply brief, that its damages were reasonably determinable based on purported intellectual property "development costs."  We reject this argument because it was raised for the first time in PMI's reply brief.  *See **Richman v. Security Sav. & Loan Ass'n***, 57 Wis. 2d 358, 361, 204 N.W.2d 511 (1973) (we need not address arguments raised for the first time in a reply brief).

[13] PMI requests that we grant a new trial on all issues and direct that the circuit court allow the jury, at a retrial, to consider an award of punitive damages on the breach of contract claims.  PMI conceded at argument that it did not request a new trial in the circuit court.  We reject this request because PMI does not dispute Teel's assertion that, by failing to request a new trial in the circuit court, PMI forfeited the opportunity to request a new trial on appeal.  *See **Ford Motor Co. v. Lyons***, 137 Wis. 2d 397, 417, 405 N.W.2d 354 (Ct. App. 1987).

## **II. Cross-Appeal.**

¶57    We now take up Teel's cross-appeal.  We begin with Teel's assertion that the circuit court erred in denying Teel's motion to change the answer to the question in the special verdict concerning breach of contract damages because, according to Teel, there was insufficient evidence to support that answer. We then discuss Teel's arguments that the circuit court erred in not granting a new trial.

### **A.  Answer to Question 5 on the Special Verdict.**

#### 1.  Applicable Standards.

¶58    As noted earlier, a circuit court may change a jury's answer to a special verdict question if there is insufficient evidence to support the answer.  *See* WIS. STAT. § 805.14(5)(c).  The sufficiency of the evidence test is set forth at § 805.14(1), and we quote that statutory subpart again for context:

> No motion challenging the sufficiency of the evidence as a matter of law to support a verdict, or an answer in a verdict, shall be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party.

¶59    "[T]he credibility of witnesses and the weight given to their testimony are matters left to the jury's judgment." ***Best Price Plumbing***, 340 Wis. 2d 307, ¶43 (quoted source omitted).  If more than one inference could be drawn from the evidence, we must accept the inference drawn by the jury.  ***Id.***  In reviewing a circuit court's decision on a request to change a jury's special verdict answer, we search for credible evidence to sustain the jury's verdict.  ***Id.***, ¶44. "When there is *any* credible evidence to support a jury's verdict, even though it

[is] contradicted and the contradictory evidence [is] stronger and more convincing, nevertheless the verdict must stand." *Id.* (quoted source omitted).

¶60 Our review is "even more stringent because the circuit court approved the jury's verdict. We afford special deference to a jury determination in those situations in which the [circuit] court approves the finding of a jury." *Morden v. Continental AG*, 2000 WI 51, ¶40, 235 Wis. 2d 325, 611 N.W.2d 659. In those cases, we "will not overturn the jury's verdict unless 'there is such a complete failure of proof that the verdict must be based on speculation.'" *Id.* (quoted source omitted).

¶61 Teel makes several arguments regarding the standards we are to apply in reviewing the circuit court's order, and we reject each.

¶62 Based on two separate arguments, Teel asserts that our review of the sufficiency of the evidence to support the answer to the special verdict question regarding breach of contract damages is de novo. First, Teel relies on language in *Herman v. Milwaukee Children's Hospital*, 121 Wis. 2d 531, 361 N.W.2d 297 (Ct. App. 1984), that, when the circuit court's analysis of the evidence supporting an award is "inadequate," an appellate court may engage in independent review of the evidence. *See id.* at 545 (citing *Roach v. Keane*, 73 Wis. 2d 524, 539, 243 N.W.2d 508 (1976)). In *Roach*, the supreme court stated: "Where the [circuit] court has reviewed the evidence and approved the damage award, this court is especially loathe to interfere." *Roach*, 73 Wis. 2d at 539. The court will do so, however, when the record shows that the circuit court "did not analyze the evidence." *Id.* As will be discussed below, the circuit court's postverdict analysis of the sufficiency of the evidence on this issue was neither "inadequate" nor absent. The circuit court's postverdict analysis of the evidence was thorough.

22

¶63    Second, Teel relies on the holding of **Schorsch v. Blader**, 209 Wis. 2d 401, 405, 563 N.W.2d 538 (Ct. App. 1997).  But, the holding in **Schorsch** concerned the "proper measure of damages for a specific claim." **Id.**  In contrast, the question before us is not the legal standard for a damages award.  Rather, the question is the sufficiency of the evidence to support the jury's special verdict answer to the breach of contract damages question.

¶64    So, we reject Teel's contention that our review of this order of the circuit court is de novo.

¶65    Next, and for two separate reasons, Teel contends that, in reviewing the circuit court's decision on Teel's postverdict motion regarding sufficiency of the evidence, we may consider only evidence presented in PMI's "case-in-chief." Teel's argument fails in light of the authorities cited by Teel.  Teel cites language in WIS. STAT. § 805.14(1) quoted in ¶58, above.  However, by its terms, that statutory subpart requires us, and the circuit court, to review "*all* credible evidence and reasonable inferences therefrom" and determine if there is "no credible evidence to sustain a finding in favor" of the jury's special verdict answers.  **Id.** (emphasis added).

¶66    The second reason asserted by Teel is that, as part of our sufficiency of the evidence analysis, Teel contends that we must decide whether the circuit court erred in not granting Teel's motion for a "directed verdict" on the damages claim.  WISCONSIN STAT. § 805.14(4) governs a "directed verdict" and states:

> MOTION AT CLOSE OF ALL EVIDENCE.  In trials to the jury, at the close of *all* evidence, any party may challenge the sufficiency of the evidence as a matter of law by moving for *directed verdict* or dismissal or by moving the court to find as a matter of law upon any claim or defense or upon any element or ground thereof.

(Emphasis added.) As demonstrated by that language, a motion for a "directed verdict" is made at the close of all evidence which, of course, necessitates review of "all evidence" in determining if the motion for a directed verdict was properly granted. *See State v. Magett*, 2014 WI 67, ¶63, 355 Wis. 2d 617, 850 N.W.2d 42 ("[A] directed verdict under subsec. (4) is to be entered only 'at the close of *all* evidence.'" (quoting § 805.14(4)).

¶67     As a result, we reject Teel's contention that we review only evidence from PMI's case-in-chief.

## 2. Scope of This Court's Sufficiency of the Evidence Review.

¶68     We now discuss why only the jury's answer to special verdict question 5 is reviewed for sufficiency of the evidence in Teel's cross-appeal.

¶69     At argument to this court, counsel for Teel conceded that Teel did not file a motion in the circuit court contending that there was insufficient evidence to support the answers to questions 1 and 2 on the special verdict concerning Teel's breach of the 50/50 agreement and the duty of good faith and fair dealing in performing that agreement. Therefore, Teel has forfeited the opportunity to argue on appeal that there was insufficient evidence to support the jury's answers to questions 1 and 2 of the special verdict. *See Ford Motor Co. v. Lyons*, 137 Wis. 2d 397, 417, 405 N.W.2d 354 (Ct. App. 1987).

¶70     Teel filed a postverdict motion in the circuit court requesting that the circuit court change the answers to special verdict questions 3 and 4, in which the jury found that Teel breached the Confidentiality Agreement and the duty of good faith and fair dealing in performing that agreement. The circuit court denied Teel's motion. In a short footnote in its brief-in-chief in this court, Teel makes

abbreviated, conclusory assertions, without citations to the record or authorities, regarding sufficiency of the evidence to support the answers to special verdict questions 3 and 4. In its response brief in the cross-appeal, PMI asserts that there was sufficient evidence to support the jury's answers to questions 3 and 4 on the special verdict. In its cross-appeal reply brief, Teel makes no attempt to rebut that sufficiency of the evidence argument from PMI. As a result, Teel has conceded the question of whether there was sufficient evidence to support the jury's answers to questions 3 and 4 on the special verdict because Teel makes no developed argument on that question, and Teel has not replied to PMI's arguments. *See State v. Pettit*, 171 Wis. 2d 627, 647, 492 N.W.2d 633 (Ct. App. 1992) (this court need not consider undeveloped arguments); *United Coop.*, 304 Wis. 2d 750, ¶39 (stating that a failure to refute a proposition asserted in a response brief may be taken as a concession).

¶71     For those reasons, we are left with only the question of whether there was sufficient evidence to support the jury's answer to question 5 on the special verdict concerning breach of contract damages.

### 3.  Sufficiency of Evidence to Support the Jury's Answer About Breach of Contract Damages.

¶72     Teel asserts that the circuit court erred in not changing the answer to the breach of contract damages question in which PMI was awarded $3,000,000 for Teel's breaches of the 50/50 agreement and the Confidentiality Agreement. We disagree with Teel and conclude that there was sufficient evidence for the jury to find that the breaches of those contracts caused damages of $3,000,000.

### a. Contract Terms, Breaches, and Damages.

¶73 As discussed, the question of whether there was sufficient evidence that Teel breached the 50/50 agreement or the Confidentiality Agreement is not before us. Nonetheless, consideration of the terms of those agreements, and Teel's breaches of those contracts, informs our damages discussion. We now summarize the circuit court's pertinent conclusions and explain that those conclusions are well supported.

¶74 We start with the circuit court's postverdict decision regarding evidence of breaches of the 50/50 agreement.

> [There is a]mple evidence [that] the parties entered into an oral agreement. Although there was conflicting testimony on the terms of that agreement, both sides agreed that there was a contract. PMI asserted that it gave Teel 50% ownership of the window technology in exchange for Teel bringing in James Hardie, a major supplier of building products, as a customer. Teel argued that it acquired 50-50 ownership because it had contributed to the development of the technology. In either event, the jury could reasonably have concluded that the parties entered an agreement whereby, as 50-50 owners, they would work jointly to bring James Hardie into the window business and that neither party could sell the technology without the other's consent.
>
> … The jury could have found that the parties agreed that they were working together, would share 50-50, and one could not sell without the other.

¶75 We now set forth the circuit court's discussion of sufficiency of the evidence regarding damages flowing from Teel's breach of the 50/50 agreement.

> Teel also claims that the jury verdict of $3 million [for breach of contract damages] cannot stand because PMI failed to introduce any evidence that PMI had the right to receive any proceeds from Teel's sale of its assets. The court agrees with Teel that there was no evidence that PMI and Teel agreed to split the proceeds of the sale of either of their businesses to James Hardie. But assuming that the

26

jury found 50-50 ownership of the technology and no sale without the other's consent, the damage then is one-half of the value of the window technology.

… PMI's expert opined that Teel's pultrusion business was failing and had no value apart from the window technology. Thus, PMI took the position that Teel only had value because of the window technology, the purchase price of $15.4 million was for that technology, and thus PMI was entitled to 50 percent of the $15.4 million, or $7.7 million. Teel countered that it was entitled to sell its half of the technology to James Hardie and therefore PMI was entitled to nothing, but Teel also challenged the valuation of the window technology by PMI's expert, arguing that Teel sold other assets (machines, land, other [intellectual property], etc) whose value must be considered in the purchase price.

Other evidence was offered and received regarding the value of the window technology. In their pitch to James Hardie, the parties themselves valued the technology at $2.2 million. Gerald Beranek, PMI's president, testified that he believed the technology was worth closer to $6 million. He also testified that PMI had invested three quarters of a million dollars in the development of the window technology. The purchase agreement between Teel and James Hardie valued the intellectual property of Teel at $4.2 million. Although Teel argues that Erik Booth from James Hardie was the only witness who could testify about James Hardie's valuation of the window technology, the jury could have chosen not to believe his testimony. The jury could have concluded that Booth was aligned with Teel. Booth's employer, James Hardie, acquired Teel and that acquisition precipitated this litigation. Moreover, the jury heard evidence that James Hardie contacted Teel because James Hardie wanted the PMI window. It was a reasonable inference that the only reason that James Hardie, a multi-national manufacturer and distributor of building supplies, was even interested in Teel was that Teel was capable of pultruding parts for windows.

¶76 Our review of the record confirms the review of the record by the circuit court. There was sufficient evidence in the record, if believed by the jury, for the jury to find that PMI and Teel entered into the 50/50 agreement as

27

described by the circuit court, and that there were damages flowing from Teel's breach of that agreement in the amounts described by the circuit court.

¶77    We next consider the Confidentiality Agreement and the relevant evidence in the record.  The Confidentiality Agreement, by its terms, required that the parties hold "Proprietary Information in confidence and[,] absent the express written permission of the other party, not disclose it to any third party or any affiliate and not use it except for the purpose of engaging in the above described business relationship…."

¶78    We now set forth the circuit court's discussion of the sufficiency of the evidence to support the jury's finding that there was at least one breach of the Confidentiality Agreement by Teel:

> The evidence also supports that the November 3, 2011 Confidentiality Agreement was a contract that Teel breached.  The parties agreed to keep their information confidential.…  [T]he jury was persuaded by PMI's assertion that the agreement covered Proprietary Information disclosed beginning on August 1, 2010.  Teel breached the agreement by disclosing PMI's confidential drawings and pricing information and passing them off as its own.

Our review of the record again confirms that of the circuit court that there was sufficient evidence in the record, if given weight by the jury, to support the jury's finding that there were breaches of the Confidentiality Agreement and, as already noted, the information about the PMI window system had value.

¶79    The circuit court concluded its discussion as follows:

> In light of the conflicting testimony regarding the value of the window technology ranging from 0 to $15.4 million, it was not excessive or unreasonable for the jury to award $3 million for PMI's half of the value of the window technology that Teel sold to James Hardie.

¶80     As our supreme court has held, and as the circuit court recognized:

> When the jury hears conflicting testimony about unliquidated damages, its verdict should not be disturbed on review when it is clear that the award arrived at is well within the range of figures placed in evidence, and that there is credible evidence to sustain the jury's finding. The capacity of the jury to approximate a fair estimate is especially important when the jury is not able to make "an exact mathematical computation" of the claimant's damages. In such a case the jury must use its best judgment to arrive at a fair result and, to that end, its award may reflect a compromise.

*Carlson & Erickson Builders, Inc. v. Lampert Yards, Inc.*, 190 Wis. 2d 650, 674, 529 N.W.2d 905 (1995) (quoted source omitted). We agree with the circuit court that the jury's award is within a range of damages given by each party. The jury heard days of testimony and argument from Teel that there were no damages from any breach of contract. In this court, Teel cites to evidence in the record the jury might have believed in support of its position on damages. But, it was within the jury's discretion to accept or reject that evidence. It is not for this court to re-weigh that evidence. *See Best Price Plumbing*, 340 Wis. 2d 307, ¶¶43-44.

### b. Teel's Other Arguments.

¶81     Teel makes three other arguments regarding sufficiency of the evidence, and we reject each.

¶82     First, Teel argues that the $3,000,000 damages verdict is not supported by sufficient evidence because, according to Teel, the award put PMI in a better position than if the 50/50 agreement and the Confidentiality Agreement had been performed. However, the jury was instructed not to do what Teel contends the jury did. Specifically, the jury was instructed, consistent with Wisconsin law, that "[a] party whose contract has been breached is not entitled to

be placed in a better position because of the breach than the party would have been had the contract been performed." We reject Teel's argument because the jury's damages award must be presumed not to have put PMI in a better position than if the contracts had been performed, and Teel gives no reason to conclude otherwise. *See Wosinski v. Advance Cast Stone Co.*, 2017 WI App 51, ¶94, 377 Wis. 2d 596, 901 N.W.2d 797 ("In reviewing jury awards, courts are 'required to presume the jury obeyed the instructions as given.'" (quoting *State v. Abbott Labs.*, 2012 WI 62, ¶103, 341 Wis. 2d 510, 816 N.W.2d 145)).

¶83 Second, Teel asserts that the breach of contract damages answer must be changed because, in the context of damages flowing from the breach of the 50/50 agreement, there is insufficient evidence that Hardie paid $6,000,000 to Teel to acquire the window technology. From that, Teel argues that PMI's breach of contract damages cannot be based on one-half the $6,000,000 amount. However, the jury was never asked to decide how much money Hardie paid to Teel for the window technology. More particularly, the jury was not required by the circuit court to separate out the damages awarded for breach of the 50/50 agreement as opposed to the damages for breach of the Confidentiality Agreement. No party appeals the jury instructions and special verdict question regarding damages, as Teel's counsel conceded at argument. Therefore, Teel's framing of the issue is far too restrictive. There were numerous combinations of potential damage amounts for each breach of the 50/50 agreement and the Confidentiality Agreement that may have led to the jury's damage award of $3,000,000. As a result, we do not accept Teel's contention that the damages finding was cabined as framed by Teel.

¶84 Third, Teel argues that there is insufficient evidence to support the damages award because of a purported necessary "factual predicate" for PMI's

damages claim. According to Teel, the basis for PMI's contention that the parties agreed they would split any proceeds from the sale of the window technology on an equal basis is that there was a "partnership" entered into by Teel and PMI. And, because no partnership was formed by PMI and Teel, Teel contends that PMI's damages claim must fail.

¶85 We start our analysis by considering the circuit court's discussion of this issue in its postverdict decision.

> Teel has repeatedly argued that because there was no legal partnership, any claim for damages because of breach of the oral agreement cannot stand. The court agreed with Teel that no legal partnership was formed under Wisconsin law.… However, the jury could have found that the parties agreed to 50-50 ownership and to act jointly to bring James Hardie into the window business and to share in the value of the window technology. The documents [prepared by Teel] are riddled with the use of the term "partner" by Teel.… When James Hardie was interested in acquiring both companies, Teel and PMI jointly presented and held themselves out as partners, *i.e.* working together to manufacture and sell windows using the PMI window technology.

¶86 Teel is correct that PMI and Teel did not enter into a partnership, and the circuit court instructed the jury that there was no "partnership" entered into by the parties. But, there is no basis in the record to support Teel's contention that the factual predicate necessary to PMI's damages claim was the existence of a partnership. Rather, as the circuit court recognized and as we have already concluded from the record, there was sufficient evidence, if believed by the jury, for the jury to find that the parties agreed to equal ownership of the window technology, and Teel would not sell that technology without the approval of PMI.

Accordingly, we agree with the circuit court that the lack of a partnership was not fatal to PMI's damages claim.[14]

¶87 In sum, we conclude that there was sufficient evidence to support the jury's answer to question 5 on the special verdict concerning breach of contract damages, and we affirm the circuit court's denial of Teel's motion to change the jury's answer to that question.

¶88 We now turn to Teel's cross-appeal of the circuit court's decision not to grant Teel's request for a new trial.

## B. Teel's Request for a New Trial.

¶89 Teel requests a new trial because the circuit court purportedly erred in: (1) denying Teel's request for a jury instruction on the elements of a partnership; (2) denying Teel's request for a jury instruction about patent law; (3) allowing PMI's attorney to use the term "partnership" in closing argument; and (4) concluding that the answers to the special verdict question about breach of contract damages is not against the weight of the evidence. We discuss each contention in turn.

### 1. Standard of Review.

¶90 The circuit court denied Teel's requests for a new trial and employed the standards in WIS. STAT. § 805.15(1), which state in pertinent part:

---

[14] In a related vein, Teel argues that the testimony of PMI's damages expert does not support the jury's award of damages because, according to Teel, PMI's expert based his opinions on the existence of a partnership between PMI and Teel. We reject this argument because the record shows that PMI's expert testimony on damages was not based on an assumption that PMI and Teel formed a partnership.

> MOTION.  A party may move to set aside a verdict and for a new trial because of errors in the trial, or because the verdict is contrary to law or to the weight of evidence, or because of excessive or inadequate damages, or because of newly-discovered evidence, or in the interest of justice.

Our review of the circuit court's postverdict denial of a motion for a new trial under § 805.15(1) is deferential.  "The [circuit] court's powers in this respect are highly discretionary and we will not reverse absent a 'clear' erroneous exercise of that discretion."  *Vogel v. Grant-Lafayette Elec. Coop.*, 195 Wis. 2d 198, 217, 536 N.W.2d 140 (Ct. App. 1995), *rev'd in part on other grounds*, 201 Wis. 2d 416, 548 N.W.2d 829 (1996).

¶91     For some issues we will discuss, Teel relies on WIS. STAT. § 752.35 as a basis to grant a new trial.[15]  We are to exercise our discretion pursuant to that statute "only in *exceptional* cases."  *State v. McKellips*, 2016 WI 51, ¶52, 369 Wis. 2d 437, 881 N.W.2d 258.  Further, "[t]o order a new trial on grounds it is probable that justice has miscarried, we must conclude that a different result is likely on retrial."  *Camelot Enters., Inc. v. Mitropoulos*, 151 Wis. 2d 277, 285, 444 N.W.2d 401 (Ct. App. 1989).

---

[15]  WISCONSIN STAT. § 752.35 states:

> In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record and may direct the entry of the proper judgment or remit the case to the trial court for entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

## 2. Partnership Jury Instruction.

¶92     Teel argues that a new trial should be granted because the circuit court erroneously exercised its discretion in not giving the jury an instruction about the elements of a partnership as Teel requested.

¶93     The Wisconsin Supreme Court has set forth the standards this court applies in reviewing a circuit court's decisions on jury instructions.

> A circuit court has broad discretion in crafting jury instructions based on the facts and circumstances of the case.  A circuit court is required, however, to exercise its discretion "to fully and fairly inform the jury of the rules of law applicable to the case and to assist the jury in making a reasonable analysis of the evidence."
>
> … Whether the circuit court erred by stating the law incorrectly or in a misleading manner constitutes a question of law this court decides independently of … the analyses of the circuit court ….

*Dakter v. Cavallino*, 2015 WI 67, ¶¶31-33, 363 Wis. 2d 738, 866 N.W.2d 656 (footnotes and quoted source omitted).

¶94     Teel argues that the lack of a jury instruction about the elements of a partnership denied Teel a "legal framework" to "debunk" the claim that a partnership existed.  Because the circuit court instructed the jury that there was no partnership formed, we presume that the jury followed the court's instruction. *See State v. Poellinger*, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990).

¶95     The circuit court concluded post-trial that it would have "confused the jury" to instruct on the elements of a partnership in light of the court's instruction to the jury that no partnership existed.  Teel gives us no reason to question that common sense approach of the circuit court.  We agree that under the circumstances it was reasonable for the circuit court to anticipate that jurors would

have been confused when, on the one hand, the circuit court instructed them that no partnership had been entered into and then, on the other hand, the jurors were given an instruction that left it to the jury to decide whether a partnership existed.

¶96    For the same reasons, we conclude that there is no basis, under WIS. STAT. § 752.35, to conclude that there was a miscarriage of justice because the proposed partnership jury instruction was not given as requested by Teel.

### 3.  Patent Jury Instruction.

¶97    Teel next argues that a new trial should be granted because the circuit court erred in denying Teel's request to instruct the jury on aspects of patent law.[16]  Teel contends that it was prejudiced because it was deprived of:  a legal basis to debunk PMI's patent ownership claims; and the opportunity to show that PMI's window technology was not "sufficiently novel" to be patented.  In its postverdict decision, the circuit court described its reasoning for not giving that proposed instruction:

> [I]t would have confused the jury to give an instruction on patent law.  Teel claims that a patent instruction was necessary to debunk the claim that PMI was originally 100% owner of the window technology.  Teel claims that the jury needed to understand how patent law affected the rights of the co-inventors, Beranek for PMI, and Emmanuel for Teel.  However, this is not a patent infringement case. This is a breach of contract case.  There was evidence to show that the original plan between the parties was that PMI would own 100% of the technology.  Emmanuel was listed as a co-inventor and PMI agreed to give up half of its rights in exchange for a 50-50 split for bringing a major customer, James Hardie, into the window business.

---

[16] Teel proposed two separate jury instructions on patent law.  The first was substantially longer than the second.  Neither party argues that the first proposed patent jury instruction is material to our analysis, so we will also ignore it.

¶98 The circuit court properly exercised its discretion in denying Teel's request because the circuit court understood that the jury was not asked to make findings regarding patent law issues. Instead, the jury was to determine rights and obligations under any contracts entered into by the parties. In crafting jury instructions, a circuit court is "to fully and fairly inform the jury of the rules of law applicable to the case." *Dakter*, 363 Wis. 2d 738, ¶31. The circuit court did so, and Teel gives us no viable reason to question the circuit court's exercise of its discretion on this question.

### 4. Use of the Term "Partnership."

¶99 Teel contends that this court should grant a new trial pursuant to WIS. STAT. § 752.35 because of the use of the term "partnership" (or variations of that term) in PMI's closing argument. According to Teel, this "inflamed the jury's passion resulting in a miscarriage of justice" because the jury treated the relationship between the parties as a partnership and awarded damages based on that relationship rather than the terms of the contracts between the parties.

¶100 We repeat the circuit court's postverdict analysis of the use of the term "partnership" in the trial record:

> The [exhibits] are riddled with the use of the term "partner" by Teel…. When James Hardie was interested in acquiring both companies, Teel and PMI jointly presented and held themselves out as partners, *i.e.* working together to manufacture and sell windows using the PMI window technology.

Our own review of the record amply supports the circuit court's conclusion about the use of the term "partnership," or a variation of that term, by the parties in documents prepared by Teel and in statements to Hardie. The record supports the circuit court's determination that allowing argument which incorporated the word

"partnership," a term the parties themselves employed in describing their relationship, was consistent with the evidence introduced at trial. Accordingly, we reject Teel's assertion that the use of the term "partnership" in PMI's closing argument inflamed the passions of the jury and resulted in a miscarriage of justice.

### 5. Teel's Request For a New Trial on Damages.

¶101 Finally, Teel contends that the circuit court erred by not granting a new trial because the verdict was contrary to the weight of the evidence. *See* WIS. STAT. § 805.15(1). More particularly, Teel argues that it was error for the circuit court not to grant a new trial because: (1) it was against the weight of the evidence for the jury to find that Hardie paid $6,000,000 for the window technology; and (2) Hardie's acquisition of Teel's pultrusion division did not cause a breach of any contract and, from that, it follows that there were no damages.[17]

¶102 We consider, first, Teel's argument about lack of evidence that Hardie paid $6,000,000 for the window technology. The circuit court recognized, as do we, that the standard to grant a new trial because the verdict is against the weight of the evidence under WIS. STAT. § 805.15(1) is different from the standard to change an answer to a special verdict question based on insufficiency of the evidence under WIS. STAT. § 805.14(1). Nevertheless, the circuit court rejected Teel's request for a new trial on this basis for the reasons, described above, that it rejected this same argument in the context of Teel's request to change the answer

---

[17] In the approximately four pages of Teel's brief-in-chief devoted to these particular questions, there are only three cites to the record in support of numerous factual allegations made by Teel. We remind counsel that factual allegations in briefing in this court require citations to the record. *See* WIS. STAT. RULE 809.19(1)(e).

to the damages question. As noted, that decision of the circuit court is "highly discretionary," and we will reverse the court's decision only if there is a "'clear' erroneous exercise of that discretion." *Vogel*, 195 Wis. 2d at 217. We have already affirmed the circuit court's rejection of this argument in the sufficiency of the evidence context, and Teel gives us no reason to question the circuit court's exercise of discretion in the context of the weight of the evidence to support the verdict.

¶103 Regarding Teel's argument that the jury's findings on breaches of the contracts were against the weight of the evidence, we again recognize, as did the circuit court, that the standards regarding a new trial based on the weight of the evidence are different from the standards to change a jury's answer based on sufficiency of the evidence. Teel gives us no reason to overturn the circuit court's exercise of discretion in rejecting Teel's assertions. Teel's argument on this question rehashes arguments rejected by the circuit court and this court. We conclude that the jury's findings are not against the weight of the evidence for the same reasons that the jury's findings were the product of sufficient evidence in the record.[18]

¶104 In sum, we conclude that the circuit court did not erroneously exercise its discretion in denying Teel's motion for a new trial, and we deny Teel's requests that this court grant a new trial pursuant to WIS. STAT. § 752.35.

---

[18] In one brief paragraph with no substantive analysis, Teel contends that PMI's arguments to the jury about Teel's "purported breaches" of the Confidentiality Agreement "fan[ned] the flames of the jury's passions." We reject this assertion because it is undeveloped. *See State v. Pettit*, 171 Wis. 2d 627, 647, 492 N.W.2d 633 (Ct. App. 1992).

## CONCLUSION

¶105 For the foregoing reasons, the judgment of the circuit court is affirmed.

*By the Court.*—Judgment affirmed.

Not recommended for publication in the official reports.